IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :      CRIMINAL ACTION
                              :      NO. 21-395
        v.                    :
                              :
ROBERT SMITH                  :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        FEBRUARY 3, 2023


## I.    INTRODUCTION AND BACKGROUND

Following a three-day jury trial, Defendant was convicted on April 20, 2022 of one count of knowing possession of a prohibited object, in the form of a metal object with one end sharpened into a spear that was designed and intended to be used as a weapon in violation of 18 U.S.C. § 1791(a)(2), (b)(3), and one count of knowingly assaulting another person with a dangerous weapon with the intent to do bodily harm while in custody of the Bureau of Prisons, in violation of 18 U.S.C. § 113(a)(3). Defendant was charged with these offenses after prison guards responded to a fight on the evening of December 22, 2020, in the common area of the 4 North cellblock in the Philadelphia Detention Center. After the fight, a shank was found in a trash can on the same floor as the Defendant's cell, and one inmate was treated for a stab wound.

Defendant now seeks acquittal, or, in the alternative, a new trial. See Def.'s Mot., ECF No. 83. Defendant initially moved for a new trial on May 2, 2022, with trial counsel. See Mot. for Directed Verdict, ECF No. 66. Defendant argued in his original motion for a directed verdict that the Government's evidence was insufficient for a rational jury to find him guilty beyond a reasonable doubt because (1) the evidence primarily consisted of videos of the Federal Detention Center (FDC), DNA evidence, and testimony of FDC COs who did not see the assault; (2) the alleged victim did not testify; (3) the Government presented no eyewitnesses; (4) the closest FDC guard to the alleged assault testified that he did not see a weapon, torn clothing, or blood; (5) the videos did not indicate that Defendant possessed contraband; (6) the videos in fact showed the alleged victim reaching into his pocket during the confrontation with Defendant, dropping an object, and that object being picked up by a different inmate; (7) the Government offered no witnesses to testify that Defendant gave the shank at issue to his cellmate; and (8) the DNA evidence on the shank could have been present even if Defendant never touched the shank. Def.'s Rule 29 Renewed Mot. for J. of Acquittal ¶¶ 8-16, ECF No. 66. The Court took this motion under advisement.

Defendant now, by and through new post-conviction counsel, asserts that the evidence was insufficient to convict him

because the evidence generally "failed to identify him as the alleged assailant beyond a reasonable doubt." Def.'s Mot. 3, ECF No. 83. More specifically, Defendant argues that the evidence presented at trial was insufficient because there were no eyewitnesses who saw the alleged interaction and the alleged victim did not testify. Id. Defendant further claims that the evidence was insufficient to establish possession of contraband, that is, a shank, because the shank was recovered in the trash, where it could have been contaminated with the DNA of Defendant, among others. Id. at 3-4.

Defendant also seeks a new trial under Federal Rule of Criminal Procedure 33(a), arguing that "the government's improper use of testimonial evidence in its opening statement" violated Defendant's Confrontation Clause rights and the Government's improper bolstering the video evidence that depicted the alleged assault warrant a new trial. Fed. R. Crim. P. 33(a) ("Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.").

The Government, in opposition, argues that the evidence was more than sufficient to convict Defendant on both counts. First, the Government argues that "[t]he evidence identifying the defendant as the attacker is overwhelming," noting that FDC Special Investigations Officer William Brandt "identified the

defendant in court and on the surveillance video on multiple occasions." Gov't Resp. in Opp'n 7, ECF No. 86. Officer Brandt's identification was corroborated by Correctional Officer (CO) Dustin Reaves as well as the video evidence, which the Government asserts "clearly shows that the person who stabbed [the victim] is the same person who returned to the defendant's assigned jail cell, and the only person fighting with [the victim]." Id. at 7-8. Further, the Government points to testimony by Nurse Brian Morris, who treated both defendant and the victim after the assault, and observed that defendant had minor facial swelling and some redness. Id. at 8. The Government also argues that, despite raising some doubts about the DNA evidence on the shank, Defendant has not met his burden of establishing that no reasonable juror could have found him guilty of possessing the shank beyond a reasonable doubt. Id. And, although there were no eyewitnesses who testified as to the assault, the Government argues that, when viewing the evidence as a whole, the video, DNA evidence, identifications, and medical treatment together support a rational jury finding that Defendant possessed the shank and used it to assault the victim. Id.

The Government also opposes Defendant's motion for a new trial under Federal Rule of Criminal Procedure 33 given the overwhelming evidence in support of Defendant's conviction.

4

Given that Defendant has neither demonstrated that the
evidence was so lacking no reasonable juror could have convicted
him, or that the interest of justice requires a new trial,
Defendant's motions will be denied.

## II.  LEGAL STANDARD

Under Federal Rule of Criminal Procedure 29, the Court "may
set aside the verdict and enter an acquittal" after a jury has
found a defendant guilty. Fed. R. Crim. P. 29(c)(2). The Court
may only set aside such a verdict if the Government's evidence
was insufficient to sustain a conviction. Fed. R. Crim. P.
29(a). A motion for acquittal should not be granted if, when
viewing the evidence in the light most favorable to the
government, "any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt."
United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998) (quoting
United States v. Voigt, 89 F.3d 1040, 1080 (3d Cir. 1996)); see
also United States v. Fattah, 914 F.3d 112, 183 (3d Cir. 2019)
("[W]e must uphold the jury's verdict unless no reasonable juror
could accept the evidence as sufficient to support the
defendant's guilt beyond a reasonable doubt." (citing United
States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987))). "The
evidence does not need to be inconsistent with every conclusion
save that of guilt if it does establish a case from which the
jury can find the defendant guilty beyond a reasonable doubt."

5

United States v. Cooper, 567 F.2d 252, 254 (3d Cir. 1977)
(quoting United States v. Allard, 240 F.2d 840, 841 (3d Cir.
1957)); United States v. Franz, 772 F.3d 134, 154 n.22 (3d Cir.
2014). The Third Circuit has accepted that it does not matter
whether the Government makes its case by direct or
circumstantial evidence, so long as "ample evidence supported
[the defendant's] conviction." E.g., United States v. Garner,
961 F.3d 264, 274 (3d Cir. 2020).

"The court may not 'usurp the role of the jury' by weighing
the evidence or assessing the credibility of witnesses." United
States v. Norris, 753 F. Supp. 492, 501 (E.D. Pa. 2010) (quoting
United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005)). As a
result, a defendant challenging the sufficiency of the evidence
in the face of a jury verdict is "extremely high." United States
v. Iglesias, 535 F.3d 150, 155 (3d Cir. 2008) (quoting United
States v. Lore, 430 F.3d 190, 203-04 (3d Cir. 2005)). This is in
part because "the mere presence of some conflicting evidence in
the record does not render a jury verdict improper"; rather,
"any conflict in the evidence must be resolved in favor of the
jury's verdict." United States v. Bates, 850 F.3d 807, 810 (5th
Cir. 2017) (quoting United States v. Lundy, 676 F.3d 444, 448
(5th Cir. 2012)); see also United States v. Phifer, 400 F. Supp.
719, 724 (E.D. Pa. 1975), aff'd 532 F.2d 748 (1976).

If the Court grants a motion for acquittal, it "must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed," specifying the reasons for that decision. Fed. R. Crim. P. 29(d)(1).

Where a defendant seeks a new trial under Federal Rule of Criminal Procedure 33, "[a] district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred--that is, that an innocent person has been convicted.'" United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (quoting United States v. Santos, 20 F.3d 280, 285 (7th Cir. 1994)). And, "[u]nlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably for the Government, but instead exercises its own judgment in assessing the Government's case." Id. (citing United States v. Lacey, 219 F.3d 779, 783-84 (8th Cir. 2000) and United States v. Ashworth, 836 F.2d 260, 266 (6th Cir. 1988)).

A motion for a new trial under Rule 33 is "not favored and should be granted sparingly and only in exceptional cases." United States v. Wrensford, 866 F.3d 76, 93 n.9 (quoting United States v. Silveus, 542 F.3d 993, 1005 (3d Cir. 2008)). If the error that a defendant argues warrants a new trial "does not

affect substantial rights," then such error is harmless and
"must be disregarded." Fed. R. Crim. P. 52(a); see also Wright &
Miller, 3 Fed. Prac. & Proc. Crim. § 581 (5th ed. 2022). "An
erroneous 'evidentiary ruling is harmless when it is highly
probable that the error did not affect the result.'" United
States v. Foster, 734 F. App'x 129, 133 (3d Cir. 2018) (quoting
United States v. Duka, 671 F.3d 329, 349 (3d Cir. 2011)). The
Government bears the burden of demonstrating that an error was
harmless. United States v. Mathis, 264 F.3d 321, 342 (3d Cir.
2001) (citing United States v. Adams, 252 F.3d 276, 281 (3d Cir.
2001)).

## III. DISCUSSION

### A.   The Evidence Was Sufficient to Support Both Counts.

#### 1.   Count 1 – Possession of Contraband in Prison

Defendant was charged with one count of being an inmate of
a prison, that is, the Federal Detention Center, Philadelphia,
knowingly in possession of a prohibited object, that is, a metal
object with one end sharpened into a spear (i.e., a shank), in
violation of 18 U.S.C. § 1791(a)(2) and (b)(3). See Indictment,
ECF No. 1.

The elements of Count One are as follows: (1) the Defendant
is an inmate of a prison who (2) knowingly possesses an object
which is (3) prohibited. See 18 U.S.C. § 1791(a)(2); Apr. 20,
2022, Trial Tr. 21:2-13, ECF No. 79; United States v. Holmes,

607 F.3d 332, 335-36 (3d Cir. 2010) (reading a common-law
scienter requirement into the statute's possession element). A
"prohibited object" includes any "weapon (other than a firearm
or destructive device), or an object that is designed or
intended to be used as a weapon or to facilitated escape from a
prison . . ." 18 U.S.C. § 1791(d)(1)(B). Defendant does not
contest that he was an inmate of a federal prison, or that a
shank would qualify as a prohibited object. At issue, thus, is
whether the evidence was sufficient to demonstrate that
Defendant possessed the shank.

The Court instructed the jury as to possession as follows:

> Now, what does knowing possession means? To
> establish a second element of the offense, the
> Government must prove that the Defendant possessed the
> prohibited object in question. To possess means to have
> something within the person's control. The Government
> does not have to prove that the Defendant physically
> held the prohibited object, that is an actual possession
> of it. As long as the prohibited object was within the
> Defendant's control, he possessed it.
> If you find that the Defendant either had actual
> possession of the prohibited object, or had the power
> and intention to exercise control over it, even though
> it was not in the Defendant's physical possession, that
> is that the Defendant had the ability to take actual
> possession of the prohibited object when the Defendant
> wanted to do so, you may find that the Government has
> proven possession
> Possession may be momentary of fleeting. The law
> also recognizes that possession may be sole or joint. If
> one person alone possesses a prohibited object, that is
> sole possession. However, more than one person may have
> the power and intention to exercise control over the
> prohibited object. This is called joint possession.
> If you find that the Defendant has such a power and
> intention, then he possessed a prohibited object even if

he possessed it jointly with another. However, near proximity to the prohibited object [or mere] presence on the property where it is located, or mere association with a person who does control the prohibited object or the property is insufficient to support a finding of possession.

Proof of ownership of the prohibited object is not required. What the Government must prove is that the Defendant knowingly possessed the prohibited object described in the indictment. This means that the Defendant possessed the prohibited object purposely and voluntarily, and not by accident or mistake. It also means that the Defendant knew the object was prohibited. Now, the term prohibited object means any object that threatens the order, discipline, or security of a prison, or the life held or safety of an individual.[1]

Apr. 20, 2022, Trial Tr. 21:19-23:5, ECF No. 79.

Defendant argues, in part, that the evidence was insufficient to prove beyond a reasonable doubt that he possessed the contraband because (1) the trash can had no lid and any inmate could have put the shank in the trash can during any given approximately 12-hour window during the day; (2) any prisoner could have made a similar weapon; and (3) the DNA evidence was inconclusive. The Government argues that the evidence was sufficient given the combination of the security footage, DNA evidence, and testimony of the COs.

---

[1] There are no challenges to the sufficiency or accuracy of the jury instructions, which were given in accordance with the Third Circuit Model Jury Instruction for knowing possession under 18 U.S.C. § 922(g). Accordingly, the Court's instruction on possession will be used to analyze the sufficiency of the evidence and the reasonableness of the jury's finding of guilt. Cf. United States v. Fields, 507 F. App'x 144, 148-49 (3d Cir. 2012) (approving a district court's use of the Third Circuit Model jury instruction on knowing possession).

First, the evidence was sufficient to support Defendant's conviction, even though any inmate could have put the shank in the trash can at any point in the day. Officers Brandt and Roman conceded that the trash cans could have been accessed by any inmate on the cell block. Apr. 14, 2022, Trial Tr. 94:19-95:4, ECF No. 50 (testimony of Officer Brandt); see also Apr. 18, 2022, Trial Tr. 110:7-111:10, ECF No. 54 (testimony of Officer Stefan Roman) (noting that inmates may move about the common areas freely during a number of hours of the day and may dispose of any trash in the trash cans, including toiletry items). In addition, Defendant's DNA expert testified that in a trash can, things like "cups, silverware, napkins, tissues," might be thrown out and "people spit into trash cans," creating some possibility that such "DNA can transfer to any other object that's in the trash can." Apr. 19, 2022, Partial Trial Tr. 127:3-7, ECF No. 81 (testimony of Mr. Young).

However, Officer Roman, who ultimately found the shank in the trash can, testified that the can was "pretty full" and the shank was located "towards the top of the garbage can." Apr. 18, 2022, Trial Tr. at 72:25-73:2, ECF No. 54. And, the security footage clearly showed an inmate moving quickly from Defendant's cell to the trash can and back after Defendant had returned to his cell and closed the door. Thus, in viewing the evidence regarding the trash can most favorably to the government, the

11

jury could have reasonably concluded that another inmate, at Defendant's request, put the shank in the trash can after the assault.

Second, although the prison shank was not particularly unique, the security footage, DNA evidence, and witness testimony together were sufficient to support the conclusion that Defendant possessed the shank. The shank consisted of a piece of scrap metal with a fabric handle and lanyard, made of shoelace and cloth from the prison-issued bedsheets--materials that any inmate could have accessed. Apr. 14, 2022, Trial Tr. at 96:12-21, ECF No. 50 (testimony of Officer Brandt). However, that any inmate could have made the shank is irrelevant given that possession does not require that a person be the "owner" of the object so long as "the individual 'knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons.'" United States v. Brown, 3 F.3d 673, 680 (3d Cir. 1993) (quoting United States v. Iafelice, 978 F.2d 92, 96 (3d Cir. 1992)). The security footage clearly showed Defendant pass an item to another inmate, who then placed something in the trash can. Later security footage depicted a prison guard retrieving something from that same trash can. Thus, the evidence, viewed in the light most favorably to the Government,

supports the conclusion that the ubiquity of the materials used to fashion the shank is irrelevant.

Third, the DNA evidence, taken together with the rest of the evidence, was sufficient to conclude that Defendant possessed the shank. The DNA found on the cloth parts of the shank are arguably the most relevant to the analysis of possession, as this is the portion of the shank that would be held during its use. Defendant argues that the DNA tests run on the shank were inconclusive. DNA from four people was noted on the handle of the shank. Apr. 14, 2022, Trial Tr. 145:8-10, ECF No. 50 (testimony of Ms. Kara Gregor). Ms. Gregor conceded that a person's DNA could be transferred to an object even if that person never touched the object. Apr. 14, 2022, Trial Tr. at 151:25-152:5, ECF No. 50. And, the amount of sample transferred by an indirect method could be more or less DNA than would be present on an object than if the person touched the object directly. Id. at 152:11-13. DNA can even be transferred from object to object while in the wash--or while in a trash can. Id. at 152:19-22; 170:23-171:6. DNA is also a durable molecule, and can remain on an object for a number of years. Id. at 159:6-22. The testimony of Officer Roman further cast doubt on the conclusiveness of the DNA evidence: after he retrieved the shank using nitrile gloves, he placed it in his pants pocket, where DNA transfer could have occurred, rather than a sterile

container. Apr. 18, 2022, Trial Tr. at 71:23, 73:4-8, ECF No. 54.

Although this testimony regarding the DNA created doubt as to Defendant's possession of the shank, the evidence viewed most favorably to the Government still supports a rational jury's finding that Defendant possessed the shank. Ms. Gregor expected that "the person who came in contact the longest with an item would be the major contributor or depositing more DNA to that sample," although it is theoretically possible for a transferor of DNA to an object to be the major source of DNA on that object. Apr. 14, 2022, Trial Tr. at 171:20-172:11, ECF No. 50. Despite the numerous samples of DNA found on the handle, the data were "consistent with Smith being a potential contributor to that major DNA profile for the swabbing from the cloth portion of the shank." Id. at 149:18-25. Moreover, approximately 84 percent of the DNA found on the cloth portions was Defendant's. Id. at 150:1-6. The data further showed a strong likelihood that Defendant, but not the victim, was in contact with the cloth handle of the shank.[2] Id. at 145:14-146:3. Viewed

_____

[2] Defendant's DNA expert cast some doubt as to the accuracy of the likelihood ratios, which described how likely it was that the DNA belonged to Defendant, or the victim, or someone else. But, the Government's witness, Ms. Gregor, stated that the lowest possible likelihood ratios were used in any given circumstance. Viewing this evidence in the light most favorable to the Government, the Court concludes that the DNA evidence was

in the light most favorable to the Government, and noting that "[t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt," Cooper, 567 F.2d at 254, a reasonable jury could have found that sufficient DNA evidence pointed towards Defendant's possession of the shank.

Accordingly, the evidence was sufficient to support Defendant's conviction of one count of possession of contraband in prison.

### 2.   Count 2 – Assault

Defendant was charged with one count of, at a place within the special maritime and territorial jurisdiction of the United States, that is, FDC Philadelphia, knowingly assaulting another person with a dangerous weapon, that is, a metal object with one end sharpened into a spear, with intent to do bodily harm, in violation of 18 U.S.C. § 113(a)(3). See Indictment, ECF No. 1.

The elements of Count Two are as follows: (1) that Defendant intentionally struck or injured an individual; (2) that Defendant used a dangerous weapon; (3) that Defendant acted with the intent to do bodily harm; and (4) that Defendant intentionally struck or injured the victim within the special

---

sufficient to show that Defendant physically possessed the shank.

maritime and territorial jurisdiction of the United States. <u>See</u>
18 U.S.C. § 113(a)(3); <u>United States v. Taylor</u>, 686 F.3d 182,
188-89 (3d Cir. 2012).

Defendant argues that the Government did not prove beyond a
reasonable doubt that he was the assailant because of the lack
of eyewitness testimony. The Government, on the other hand,
contends that "[t]he evidence identifying the defendant as the
attacker is overwhelming." Gov't Resp. at 7, ECF No. 86.
Defendant does not appear to contest that a dangerous weapon was
used, that there was some intent by the assailant to cause
bodily harm, or that the alleged assault depicted in the
security footage occurred within the special maritime and
territorial jurisdiction of the United States. <u>See</u> Def.'s Mot.
at 3, ECF No. 83. It is also uncontested that the victim was
treated for some sort of injury caused by another person on
December 22, 2020. <u>See, e.g.</u>, Gov't Ex. 18 (nursing evaluation
report of the victim). Thus, at issue is whether the jury could
have reasonably found that Defendant was the assailant.

First, multiple officers observed Defendant in close
proximity to the alleged victim--either in-person or via
security footage--immediately after the assault. Officer Brandt
identified Defendant and the victim in the security footage, on
the basis of familiarity with these inmates as a part of his
daily work. <u>See</u> Apr. 14, 2022, Trial Tr. at 32:17-33:3, 53:5-9,

16

53:23-25, 55:21-25, 60:15-16, ECF No. 50. Officer Dustin Reaves, a CO who was assigned to Unit 4 North also had familiarity with Defendant and the victim from his daily work duties. See Apr. 18, 2022, Trial Tr. 37:5-38:8, ECF No. 54 (identifying Defendant in court and testifying generally as to his familiarity with Defendant). Although Officer Reaves did not witness the incident in its entirety, he "heard a slapping sound" and "noticed two inmates standing in front of [his] office with their hands raised in a -- kind of a fighting position exchanging strikes between each other to their upper bodies." Apr. 18, 2022, Trial Tr. 38:16-20. Officer Reaves threatened to use pepper spray if the inmates did not separate; the inmates then separated and walked upstairs, where the resumed fighting in the doorway to Defendant's cell. Id. at 39:17-23. Thus, identification evidence by COs during and immediately after the altercation supports a finding that Defendant was involved in the assault.

Second, as discussed above, the Government presented DNA evidence that strongly tied Defendant to the shank. The analysis of the sample identified on the blade of the shank showed that (1) there was DNA from two males, (2) such DNA had a very strong likelihood of belonging to both the victim and Defendant, and (3) approximately 93 percent of the sample was attributable to the victim. Apr. 14, 2022, Trial Tr. 139:15-144:1, ECF No. 50 (testimony of Ms. Gregor); see also Gov't Ex. 23. Although

Defendant's DNA expert, Mr. Arthur Young, suggested that the DNA evidence that was a strong match for the victim could not conclusively be determined to be blood because a certain analytical test, the Takayama test, was not used, the Government's witness, Ms. Gregor, testified that the strength and robustness of the DNA found on the blade of the shank corresponded with a blood sample, rather than merely touch DNA. Mr. Young also testified that the evidence was hypothetically consistent either with Defendant stabbing the victim, or, with Defendant never having touched the shank and someone else stabbing the victim, or with Defendant never having touched the shank and someone else "striking" but not stabbing the victim with the shank. Apr. 19, 2022, Partial Trial Tr. 125:22-126:12, ECF No. 81. But, given the security footage, DNA evidence, and testimony from COs and DNA experts, it was reasonable for the jury to conclude that the DNA evidence was the most consistent with Defendant stabbing the victim, even though the other scenarios laid out by Mr. Young were plausible. Viewing the evidence in the light most favorable to the Government, the jury reasonably could have found that the victim's DNA was on the blade, but not the cloth portions, because he was stabbed by Defendant.

Thus, viewing all the evidence in the light most favorable to the Government, the evidence was sufficient to convict

Defendant of one count of assaulting another person with a dangerous weapon while in a federal detention center.

**B.   The Interest of Justice Does Not Require a New Trial.**

Defendant seeks a new trial to remedy (1) the Government's reference to testimonial statements of the victim in its opening statement and (2) the Government's bolstering of video evidence through narration by government witnesses, both in the face of the Court's explicit directives to the Government not to reference the victim's testimony or narrate the video evidence. See Def.'s Mot. at 4. The Government argues that Defendant has not met the high bar for ordering a new trial: he has not demonstrated that he suffered any prejudicial errors during trial. Gov't Resp. at 9-12.

1.   Opening Statements

Defendant argues that the testimonial statement referenced in the Government's opening statement was used in violation of Defendant's Sixth Amendment rights. The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. A person is generally deemed to be a "witness" when they have provided "testimonial" statements against a defendant.

As the Supreme Court delineated in Davis v. Washington:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822 (2006). The Supreme Court has since counseled lower courts to consider the objective circumstances of a particular encounter to discern the primary purpose of the "interrogation," including, but not limited to, whether the encounter with law enforcement was "at or near the scene of a crime versus at a police statue, during an ongoing emergency or afterwards," and "the statements and actions of both the declarant and interrogators." Michigan v. Bryant, 562 U.S. 344, 360, 367 (2011).

When a defendant raises a Confrontation Clause challenge, the Court considers first whether a statement was testimonial, and second, whether it was offered for a non-hearsay purpose—that is, whether it was offered for something other than the truth of the matter asserted. See Lambert v. Warden Green SCI, 861 F.3d 459, 469 (3d Cir. 2017).

During the Government's opening statement, counsel stated:

> Members of the jury, you'll hear from a number of witnesses in this case. They'll tell you exactly what happened that day. But I want to make one thing very clear. While you're going to hear from the correctional officer who was assigned to the housing unit that day,

20

you'll hear from the correctional officer that found the knife, but one of the people that you will not hear from, and I want to be clear, is the victim in this case. You'll hear that he did not want to cooperate with this investigation.

Apr. 14, 2022, Trial Tr. 15:24-16:7, ECF No. 50. Defense counsel made no objections during the Government's opening statement.[3] See generally id. 13:19-17:18. However, after opening statements had concluded, Defense counsel raised an objection to the Government's statement that the victim did not wish to cooperate, arguing that such a statement was testimonial. Id. at 23:9-21. The Court noted that it would be testimonial if the Government alluded to what the victim had said in response to requests to assist in the investigation, but the statement was not testimonial if the Government merely stated that the victim refused to cooperate. Id. at 24:6-12. The Court previously ruled that the Government's opening statement's mention of the victim's decision not to cooperate could not be considered

---

[3] During the pretrial hearing on April 13, 2022, Defense counsel did object to the Government's potential use of statements by the alleged victim to Officer Brandt, as "out of court testimonial statements made in the course of an investigation" which would violate Defendant's Confrontation Clause rights. Apr. 13, 2022, Trial Tr. 17:18-18:8, ECF No 49. The Government agreed that the use of such out-of-court testimonial statements would be improper, and noted that "the Government does not intend to elicit any statements on direct examination" of Officer Brandt. Id. 18:10-11. The Government thus was clearly on notice that a Confrontation Clause issue might arise if it were to reference statements by the absent victim in the case.

"testimonial evidence" in violation of the Confrontation Clause because "[a]rgument by counsel is not considered testimonial evidence and, in any event, it can otherwise be cured by an instruction to the jury." Order, ECF No. 41 (citing United States v. Sandini, 88 F.2d 300 310-11 (3d Cir. 1989); see also Highsmith v. Secretary, Fla. Dep't of Corrections, No. 13-cv-619, 2016 WL 5373300, at *10 (M.D. Fla. Sept. 26, 2016) (stating, without analysis, that a prosecutor's comment during their opening statement that a victim "could not assist in any way in catching the man that did this to her" and "[a]s homicide victims never come to this courtroom neither will [the victim]," was not testimonial hearsay barred by the Sixth Amendment).

In the event the Government's statement could be considered "testimonial," the Government has argued it was not used for the truth of the matter asserted--whether or not the victim had cooperated in the investigation--but rather, whether the Government was thorough in its investigation of the assault. The Government sought to elicit testimony from another witness, Agent Benjamin Paris, to support its point that the investigation was thorough, but the Court ultimately precluded the Government from using Agent Paris during its case-in-chief because Agent Paris's testimony regarding the victim's

willingness to cooperate were clearly testimonial.[4] See Apr. 19, 2022, Partial Trial Tr. 19:6-25:25, 43:22, ECF No. 81.

Additionally, the Court instructed the jury before opening statements, "Statements, arguments, and questions by the lawyers are not evidence in the case." Apr. 14, 2022, Trial Tr. at 9:5-6, ECF No. 50. A similar instruction was given immediately prior to the jury's deliberations:

> The following, however, are not evidence and may not be considered by you, the indictment in the case, statements and arguments of the lawyers for the parties in the case, including anything the lawyers may have said about the facts of the case during opening statements and closing statements, questions by the lawyers and questions that I may have asked, if that happens, objections by the lawyers including objections that stated facts, any testimony that I instruct or told you to  disregard if that happens, and anything that you may have seen or heard about this case outside the courtroom.

Apr. 20, 2022, Trial Tr. at 6:16-25, ECF No. 79.

Given that the instructions to the jury--both before opening statements and after closing argument--reiterated that

---

[4] The Government attempted to interview the victim on two occasions, April 6, 2021, and April 8, 2022. Apr. 19, 2022, Partial Trial Tr. at 19:9-11, ECF No. 81. On the more recent occasion, Agent Paris stated that the victim "was brought down [from his cell at the FDC], brought over to the Marshals. I picked him up at the Marshals, walked him over [to the federal building across the street]. In this instance it was myself [and two Assistant United States' Attorneys] present." Id. at 21:2-5. This formal setting, with an FBI agent, two AUSAs, and potentially at least one United States Marshal--on the eve of trial no less--would clearly produce a testimonial statement barred by the Sixth Amendment.

argument by counsel is not evidence, and that the Government did
not again raise the issue of the victim's unwillingness to
cooperate, the Court cannot find that Defendant has demonstrated
that a "there is a serious danger that a miscarriage of justice
has occurred." Johnson, 302 F.3d at 150 (quoting Santos, 20 F.3d
at 285). To the extent it was error to allow the Government to
broadly state that the victim decided not to cooperate, such
error was harmless in light of the entirety of the trial. See
Fed. R. Crim. P. 52(a). Defendant has not sufficiently shown how
he may have been prejudiced by this single statement.

The Court must evaluate, however, whether the cumulative
effect of the Court's alleged errors created too high a risk
that an innocent person was convicted.

### 2.   Testimony Regarding the Security Footage

Defendant's second grounds for a new trial are based upon
the Government witnesses' testimony accompanying the security
footage of the prison from the night in question. Defendant does
not identify the legal basis for the objection. Given that
objections were made during trial as to the cumulativeness of
the evidence and the potential improper opinion testimony of lay
witnesses, the Court evaluates the objections under Federal
Rules of Evidence 403 and 701.[5]

---

[5] Defense counsel raised the issue of improper narration of
videos prior to trial. Apr. 13, 2022, Trial Tr. 19:12-15, ECF

Under Rule 403, "[t]he court may exclude relevant evidence
if its probative value is substantially outweighed by a danger
of . . . needlessly presenting cumulative evidence." Fed. R.
Evid. 403. Rule 701 limits opinion testimony by lay witnesses
"to one that is: (a) rationally based on the witness's
perception; (b) helpful to clearly understanding the witness's
testimony or to determining a fact in issue; and (c) not based
on scientific, technical, or other specialized knowledge." Fed.
R. Evid. 701.

It is not per se improper under Rule 701 to allow a fact
witness to testify as to a surveillance video of events "in

---

No. 49. Defense counsel conceded that the video was proper
evidence of the incident; however, Defense counsel argued that,
"for [Officer Brandt] to narrate the video in any way, to
describe what he is witnessing, or what he is seeing, or what
he's previously reviewed in that video, however many times he's
reviewed that video, that that would be unnecessarily bolstering
a piece of evidence to the jury, and it would also be
inadmissible opinion testimony." Id. 19:16-25.

The Government argued that Officer Brandt's "testimony and
any narration thereto is probative and valuable to the jury in a
sense that it colors and describes and calls attention where to
look in a video. . . . [I]t's not an expert opinion in this
case. He's testifying to what he learned as a result of his
investigation and how he knows that this is this person." Id.
21:8-15.

The Court then concluded that Officer Brandt could
authenticate the video and place the video in context; however,
such testimony "could spill over into some kind of opinion as to
. . . who did what to whom. And I think that's probable where he
should stop." Id. 21:21-22:6. The Court then instructed the
Government that it "should not ask [the witness] to conclude
then what is happening [in the video]. I think that's for the
jury to decide." Id. 22:7-11.

which [the witness] took part." United States v. Shabazz, 564 F.3d 280, 287 (3d Cir. 2009). A witness may also narrate surveillance footage that they have observed many times so long as their observations are "rationally based on [their] perceptions." United States v. Brown, 754 F. App'x 86, 89 (3d Cir. 2018); see also United States v. Torralba-Mendia, 784 F.3d 652, 659 (9th Cir. 2015) ("[A]n officer who has extensively reviewed a video may offer a narration, pointing out particulars that a casual observer might not see."). This applies to frame-by-frame narrations of pixelated footage to highlight "what the jury could not clearly see viewing the footage at full speed." Brown, 754 F. App'x at 89.

Defense counsel objected multiple times to purported narration of the security footage. First, in response to the Government's question, "What did we just see in the top left corner," Officer Brandt responded, "You saw Inmate Smith go into his cell 450." Apr. 14, 2022 Trial Tr. 46:7-9, ECF No. 50. Defendant objected, and the Court clarified: "He c[an] identify the players, he c[an] speak to context, and then the video would speak for itself. But he has to say that's Mr. Smith . . . on the top floor and that's Mr. Hughes on the bottom floor . . . et cetera." Apr. 14, 2022, Trial Tr. 47:2-9, ECF No. 50. The Court further noted that Officer Brandt's testimony that Defendant "went into his cell" was proper because Officer Brandt "knows

26

the cell. He knows Mr. Smith, so that's just a fact that he's testifying to. That's not an opinion." Id. at 48:18-21. The Court then reiterated that Officer Brandt was permitted "to identify players in context" but stated that "[i]f that spills into opinion testimony at some point," the Court would again address the issue. Id. at 51:2-5.

Officer Brandt's testimony regarding the security footage continued after Defendant's objection. Officer Brandt primarily pointed out who was where and when--not just Defendant, but pointed to the locations and movements of other inmates and COs who were known to him. See id. at 55:21-63:25, ECF No. 50.

Defense counsel preemptively raised the issue of video narration again while another Government witness, Officer Reaves, was on the stand. The Court limited his testimony to identification, such as "that's me over here . . . that's me over there," again stating that the witness could not simply narrate the video. E.g., Apr. 18, 2022, Trial Tr. at 48:1-9, ECF No. 54. Accordingly, Officer Reaves limited his testimony to where he was, where the inmates were, and what he was doing. Id. at 50:3-54:2.

The Court, upon its own examination of the security footage, finds that security footage comprising Government's Exhibit 2 clearly shows an assault. It appears that some form of blade was used, as a glare from a metallic object in Defendant's

27

hand could be seen as Defendant wound up to strike the victim on the ground floor common area. After the assault had ended and Defendant returned to his cell upstairs, the video shows another inmate picking something up from under the cell door and quickly going towards the trash can near the showers to throw something out. Another clip of the video shows an officer retrieving something from that same trash can. These general actions could be observed without narration.

Although the general movements of inmates and COs were clear, the identification of the various inmates and prison guards involved was necessary to understand who was where and when. Most jurors likely have not seen the inside of the Federal Detention Center before, and would need to hear testimony from at least one witness as to multiple camera angles to understand the physical context for the alleged assault and subsequent disposal of the shank. Identification of inmates and guards was also key to understanding who grabbed an object from outside Defendant's cell and moved it into the trash can, and who recovered it. Such testimony--identifying people and places in the cell block in a manner consistent with facts, rather than opinions or legal conclusions--was entirely proper. E.g., Brown, 754 F. App'x at 89. And, to the extent that some of the narration was superfluous, such potential error was entirely harmless, as the video was sufficiently clear for the jury to

make their own conclusions about the footage regardless of the Government witnesses' testimony. <u>See</u> <u>United States v. Foster</u>, 734 F. App'x 129, 133 (3d Cir. 2018).

Thus, any legal error under Rules 403 or 701 as to the Government's witnesses' testimony regarding the security footage was also harmless, as the jury could come to their own conclusions about the assault, in light of the security footage, DNA evidence, and other testimony. To the extent that there were errors in allowing this testimony, such errors together with the Government's mention of the victim's absence in opening statements, do not rise to the level of risking convicting an innocent man. <u>See</u> <u>Johnson</u>, 302 F.3d at 150 (quoting <u>Santos</u>, 20 F.3d at 285). Defendant has not shown that he is entitled to a new trial under Rule of Criminal Procedure 33(a) because of narration of the videos by Government witnesses.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for acquittal and motion for a new trial are denied. The evidence was sufficient to convict Defendant on both counts, and he has not demonstrated that the interest of justice requires vacatur of his conviction.

An appropriate Order follows.